**CUMBERLAND TYPOGRAPHICAL UNION NO. 244, Plaintiff–Appellee,**

v.

**THE TIMES AND ALLEGANIAN COMPANY, Defendant–Appellant.**

No. 90–2480.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1991.

Decided Aug. 19, 1991.

As Amended Sept. 12, 1991.

---

James Anthony Rydzel, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendant-appellant.

Richard Rosenblatt, Englewood, Colo., argued (Norman M. Gleichman, Washington, D.C., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, HALL, Circuit Judge, and KELLAM, Senior District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

ERVIN, Chief Judge:

The Times & Alleganian Company, a newspaper publisher, appeals the district court's order compelling arbitration with Cumberland Typographical Union No. 244 ("Union") of a dispute which arose under an expired collective bargaining agreement concerning that agreement's lifetime job guarantee provision. We find that the district court correctly applied Section 301(a) of the Labor–Management Relations Act of 1947, 29 U.S.C. § 185, to compel the arbitration, and therefore we affirm.

### I.

The Times & Alleganian Company ("Company") publishes a daily newspaper in Cumberland, Maryland. The Union is the exclusive bargaining representative for the Company's composing room employees. The parties have negotiated numerous successive collective bargaining agreements.

In 1976, the Union and Company negotiated a lifetime job guarantee agreement ("LJG") for the composing room employees. The LJG was published initially in the parties' 1976 collective bargaining agreement and republished in all successive collective bargaining agreements, unchanged from its original form. In pertinent part, the LJG provides as follows:

The Employer agrees that all employees (journeymen and apprentices), covered by this agreement with a priority date of November 1, 1976 or earlier, whose names appear on the attached priority list will be retained on situations for the remainder of their working life unless

vacating same through retirement, resignation, permanent disability, death or discharge for cause. Provided, however, in the event of permanent suspension of the Employer's operation such employment guarantee will thereupon cease, and provided further, in case of a strike, lockout, Act of God, or other situation over which Employer has no control, results in a period of temporary suspension of the Employer's operations, the job guarantee will be suspended for such period of temporary suspension of operation only.

The terms of this Article shall continue in force through succeeding agreements unless changed by mutual agreement between the parties. Because of and in consideration of the unique job guarantee set forth in this agreement, it is specifically agreed that the Company shall have the right to take full advantage of all automation and technology development which, in the opinion of the Company, would improve productivity, efficiency, and/or economy, provided, however, the above individual lifetime job guarantee will not be affected by the introduction of any new equipment or procedures.

The parties' most recent collective bargaining agreement expired by its terms on October 31, 1987. After bargaining over 19 months for an agreement to succeed the expired one, the parties reached agreement on all terms and conditions of employment in the new contract except wages. During the negotiations, the parties continued to abide by all of the terms and conditions of employment specified in the expired agreement.

In negotiating the wage issue, the Company insisted that the wages of the LJG employees would be cut from $434.50 per week to $302.00 per week. The Union, denying that impasse had been reached, rejected this proposal on the ground that it violated the continuing LJG. By letter dated June 13, 1989, the Company unilaterally implemented its wage cut proposal. At the same time, the Company implemented all other contractual terms previously agreed to between the parties, including the continuation of the grievance-arbitration procedure used in the expired agreement. That procedure specifically provided that all disputes which might arise as to the construction to be placed upon any clause of the agreement, and which could not be resolved by the specified internal grievance procedure, were to be referred to arbitration.

The Union filed a grievance, alleging that the Company's unilaterally-imposed wage reduction violated the continuing LJG agreement. As provided by the grievance-arbitration procedure, the Joint Standing Committee met to discuss the Union's grievance. The Committee, comprised of two Union and two Company representatives, did not resolve the grievance. The Union then requested that the grievance be referred to arbitration, but the Company refused to arbitrate.

The Union filed the suit underlying this appeal in the United States District Court for the District of Maryland pursuant to Section 301(a) of the Labor–Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185. The Union sought to compel arbitration and, alternatively, to obtain a declaratory judgment that the wage reduction was unlawful. The parties stipulated to all material facts [1] and filed crossmotions for summary judgment on the claim regarding arbitration. The district court dismissed the declaratory judgment claim without prejudice.

The district court granted summary judgment for the Union, ordering the parties to submit the dispute to binding arbitration and staying the action pending the outcome of the arbitration. The court held that, since the wage reduction arguably had an impact upon the preexisting job guarantees of the LJG and since the LJG was a vested right, under the parties' arbitration clause any dispute arising out of the job guarantee is subject to arbitration.

---

1. Among the undisputed facts are (1) that the LJG continues in effect, and (2) that the arbitration clause is binding in this dispute.

However, the court limited the arbitrator's role to determining whether the wage cut imposed by the Company violated the LJG, prohibiting the arbitrator from "setting or suggesting an acceptable wage." The court's order provided that, if the arbitrator struck down the wage cut, the parties would continue the collective bargaining process.

The Company now appeals to this court.

## II.

■ A party cannot be compelled to submit a dispute to arbitration unless he has contractually agreed to do so. *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648, 655 (1986). A party's agreement to arbitrate is a matter of contract construction and whether a dispute is arbitrable under a collective bargaining agreement is a question of law for the court. *AT & T, supra*, 475 U.S. at 649, 106 S.Ct. at 1418, 89 L.Ed.2d at 656; *International Union, UAW v. Exide Corp.*, 688 F.Supp. 174, 180 (E.D.Pa.1988). If the court determines that the matter in dispute is a matter designated for arbitration by the parties in their contract, Section 301(a) of the LMRA allows the specific enforcement of the arbitration agreement. *Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 450–51, 77 S.Ct. 912, 914, 1 L.Ed.2d 972, 977 (1957).

■ The Supreme Court has established four principles to guide courts in determining whether a labor dispute is arbitrable. Under the first principle, the parties must have contracted to submit the grievance to arbitration. The second principle requires that the court determine whether the contract provides for arbitration of the particular grievance in question. The third principle demands that the court not decide the merits of the grievance while determining the arbitrability of the dispute. Finally, if the contract contains an arbitration clause, a presumption of arbitrability arises. The court should not decline to order arbitration "unless it may be said with positive assurance that the arbitration clause is not

susceptible of an interpretation that covers the asserted dispute." *AT & T, supra*, 475 U.S. at 650, 106 S.Ct. at 1419, 89 L.Ed.2d at 656 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409, 1417 (1960)). The Court has thus made it clear that, except for matters specifically excluded from arbitration in the collective bargaining agreement, all questions on which the parties disagree must be submitted to arbitration. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. Warrior & Gulf, supra; United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

■ The district court in this case correctly found that the collective bargaining agreement did not specifically exclude from arbitration the continuing job guarantee provision. In fact, the wording of the grievance-arbitration clause indicates that the parties intended this provision to be subject to arbitration. This clause states, in pertinent part:

> ... To this Joint Standing Committee shall be referred all disputes which may arise as to the construction to be placed upon *any clause of the agreement* ... or alleged violations thereof, which cannot be settled otherwise.... Should the Joint Standing Committee be unable to agree then it shall refer the matter to a board of arbitration.... The decision of this board shall be final and binding upon both parties ...

(Emphasis added).

The Company alleges, however, that the district court did not have jurisdiction under Section 301 to compel arbitration of this dispute because, since the collective bargaining agreement had expired at the time the dispute arose, there was no agreement in effect. The Supreme Court significantly undermined this argument in *Nolde Bros. Inc. v. Bakery & Confectionery Workers Union*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). There the Court held that the termination of the col-

lective bargaining agreement does not automatically extinguish the duty to arbitrate grievances which arose under that contract. 430 U.S. at 250–51, 97 S.Ct. at 1071–72, 51 L.Ed.2d at 308–09. A dispute "arises under" the agreement when it concerns an obligation arguably created by the expired agreement, so that the resolution of the claim hinges on the interpretation ultimately given to the contract clause which engendered the claim. 430 U.S. at 249, 97 S.Ct. at 1070, 51 L.Ed.2d at 307. The Court further held that the strong presumption favoring arbitrability must be negated expressly or by clear implication that the parties intended their arbitration duties to terminate automatically with the end of the contract. 430 U.S. at 253–55, 97 S.Ct. at 1073–74, 51 L.Ed.2d at 309–11. *See also Litton Financial Printing Div. v. NLRB,* — U.S. —, —, 111 S.Ct. 2215, 2223–25, 115 L.Ed.2d 177 (1991) (reaffirming validity of *Nolde* presumption favoring arbitrability).

The Company claims that the dispute in this case did not "arise under" an expired contract, and that *Nolde* did not address the issue of whether unilateral implementation of a contract was a sufficient basis for Section 301 jurisdiction. It is clear from the wording of the parties' grievance-arbitration clause that any dispute over the construction of the LJG was covered by this broad grievance-arbitration procedure during the term of the collective bargaining agreement. Moreover, as the district court observed, the job guarantee right is a vested right that continues after the expiration of the main collective bargaining agreement. The cases interpreting *Nolde* have held that in order to "arise under" an expired contract, a dispute must involve rights which to some degree have vested or accrued during the life of the contract. *Litton v. NLRB, supra,* — U.S. at —,

111 S.Ct. at 2225–27; *see, e.g., United Food & Commercial Workers v. Gold Star Sausage Co.,* 897 F.2d 1022, 1024 (10th Cir. 1990) (finding that unilateral offer did not constitute contract needed to support Section 301 jurisdiction, where disputes at issue involved rights which were not vested in the expired contract). The parties here expected that the LJG would continue after the expiration of the main collective bargaining agreement. If they had intended to exclude arbitration of disputes over the vested job guarantee right after expiration, one would expect to find such an exclusion in the grievance-arbitration clause.

Moreover, the district court found a present agreement to arbitrate, evidenced by the parties' manifest intent to abide by the agreed-upon provisions of the expired collective bargaining agreement. After the agreement expired, the parties continued to abide by all its terms. The Company included the previously agreed-upon grievance-arbitration procedure in its unilateral final offer. The parties utilized this procedure to deal with the Union's subsequent grievance concerning the imposed wage rate. When presented with the Company's last offer, the Union employees did not expressly reject it, but continued to perform their duties while registering a grievance concerning the single provision found objectionable.[2] Several Circuits have found, in similar cases, that the parties' conduct manifested an intent to accept arbitration despite the absence of a complete collective bargaining agreement. *Int'l Brotherhood of Boilermakers, Local 1603 v. Transue & Williams Corp.,* 879 F.2d 1388, 1392–93 (6th Cir.1989) (holding that a labor contract may fall within the parameters of Section 301 even if the employer and the union have not resolved disputes over substantive terms, including wage rates and work place conditions); *United*

**2.** *International Union, United Mine Workers v. Big Horn Coal Co.,* 916 F.2d 1499 (10th Cir. 1990), on which the Company relies for its argument that unilateral implementation does not constitute a Section 301 contract, actually supports finding a Section 301 contract in this case. The court held that employer implementation of a last and final offer is, by itself, insufficient to invoke Section 301 jurisdiction *"... absent some*

*manifestation of acceptance of an offer sufficient to create a contract,"* 916 F.2d at 1501 (emphasis added). As an example of the latter, the court cited *Taft Broadcasting Co. v. NLRB,* 441 F.2d 1382 (8th Cir.1971), a case where an employer's implementation of its last offer constituted an invitation to enter into an interim unilateral contract, accepted by the employees' continued performance. 916 F.2d at 1502.

*Paperworkers v. Wells Badger Industries, Inc.*, 835 F.2d 701, 703–05 (7th Cir.1987); *Taft Broadcasting Co. v. NLRB*, 441 F.2d 1382, 1385 (8th Cir.1971) (noting that the lack of agreement on all terms and conditions did not alter the fact that there was a limited agreement concerning the matters affirmatively expressed).

The Company claims, however, that neither its conduct nor the language of the grievance-arbitration provision manifested an intent to arbitrate "new contract" provisions different from the comparable provisions in the expired agreement, *i.e.*, the new wage rate. It argues that the Union's present grievance concerning the Company's unilateral imposition of a lowered wage rate is not a dispute over whether rights guaranteed by the LJG have been violated, but an attempt to force arbitration of a more favorable wage rate for the new contract which the Union was unable to negotiate successfully.

On the contrary, the Union is seeking arbitration of rights vested in the previous collective bargaining agreement: arbitration which "relates either to the meaning or proper application of a particular provision with reference to a specific situation." *Elgin, J & E Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886, 1894 (1945), *aff'd on reh'g*, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). The Union is not seeking a "future collective bargaining agreement" through arbitration (*i.e.*, "interest" or "new contract" arbitration), but enforcement of the existing continuing job guarantee agreement.[3] The Union contends that the type of significant wage rate decrease implemented by the Company violates the LJG by rendering it a nullity—in effect, that the Company is attempting to accomplish, over time, a constructive discharge of the employees protected by the LJG. The district court properly found

that, to the extent that a Company proposal concerning new wages, hours, or other critical terms of employment threatens the effectiveness of the LJG, that proposal is not merely a "new contract" provision—it alters rights vested by the LJG and thus is subject to arbitration. *See Chicago Typographical Union v. Chicago Newspaper Publishers' Assoc.*, 853 F.2d 506, 510 (7th Cir.1988) (rejecting argument that union's grievances amounted to "interest" arbitration, court compelled arbitration where proposals in employer's final offer violated specific guarantees in lifetime job provision of expired agreement); *Tribune Review Publishing Co. v. Greensburg–Jeannette Typographic Union, Local 668*, No. 55–300–0105–86 (April 27, 1987) (Dean, Arb.), *enf'd*, No. 87–1072, 1988 WL 216168 (W.D.Pa. June 8, 1988) (Company's unilateral reduction of work week and hourly wages constituted violations of lifetime job guarantee provision in expired agreement).

The Company argues that to compel arbitration will promote labor unrest when the outside arbitrator imposes contract terms unguided by economic forces and agreed-upon standards. The courts, it is asserted, cannot bind the parties in perpetuity to forego the use of economic weapons in support of their bargaining positions. *See NLRB v. Columbus Printing Pressmen*, 543 F.2d 1161, 1169–70 (5th Cir.1976). Yet lifetime job guarantees such as the one presently at issue owe their existence to the recognition, both by the relevant unions and the employers in the printing industry, that technological advances in that industry are gradually bringing about the demise of the bargaining unit and its bargaining power. Knowing that they would eventually lose the economic ability to enforce contract demands, the unions in negotiating these provisions traded opposition to management's availing itself of new technology for a guarantee of job security with

**3.** The Supreme Court has distinguished "new contract" arbitration, which relates to disputes which look to the acquisition of rights for the future and not to the assertion of rights claimed to have vested in the past, from "rights" arbitration, in which the claim is to rights that have accrued and not merely to have new rights created for the future. *Elgin, Joliet & Eastern*

*Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886, 1894 (1945), *aff'd on reh'g*, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). "Rights" disputes are normally resolved through arbitration, while disputes concerning the terms of a future contract are to be resolved through collective bargaining negotiations. 29 U.S.C.A. § 158(d) (West Supp.1991).

**407**

an implicit covenant of good faith to provide an hourly wage that will be reasonable under all pertinent circumstances. *Tribune Review, supra,* slip op. at 16–17. Thus, the unarguable benefits of negotiation versus arbitration concerning wages and hours in the typical industry do not apply in this situation, where the Union essentially has no economic weapons with which to preserve the LJG as a meaningful provision in the future.[4]

The Company raises the specter of public policy violated by an arbitrator empowered to perpetuate a "new contract" arbitration provision, citing *NLRB v. Columbus Printing, supra,* 543 F.2d at 1169–70 and *Bally Mfg. Corp. v. Int'l Brotherhood of Electrical Workers, Local Union No. 713,* 605 F.Supp. 110 (N.D.Ill.1985). Neither of these cases involved the situation presented in the case at bar, where the "new contract" provision has a direct and substantial effect upon a vested arbitrable right. Furthermore, as stated above, the Company is being compelled to arbitrate the effect of the wage provision upon the job guarantee. The arbitrator is prohibited from substituting his judgment by setting a new wage. Thus, public policy is not violated by compelling the parties to go to arbitration. To the contrary, sending this matter to arbitration in order to preserve a negotiated provision in a labor contract is strictly in the public interest, for it will encourage "the continued reliance on arbitration, rather than strikes and lockouts, as the preferred method of resolving disputes arising [out of] a collective-bargaining agreement" in order to promote "the long-standing federal policy of promoting industrial harmony through the use of collective bargaining agreements." *AT & T, supra,* 475 U.S. at 648, 651, 106 S.Ct. at 1418, 1419.

Having reviewed the district court's reasoning *de novo,* we find that the Union was entitled to judgment as a matter of law on the issue of arbitrability of this dispute. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142, 154 (1970); *Higgins v. E.I. Du Pont De Nemours & Co.,* 863 F.2d 1162, 1166–67 (4th Cir.1988). Accordingly, the district court's order that the dispute be referred to binding arbitration, with limitations on the arbitrator's power to set or suggest an acceptable wage, is

AFFIRMED.

---

**4.** The Company cites in support of its argument only one case involving the printing industry, *NLRB v. Columbus Printing Pressmen,* 543 F.2d 1161 (5th Cir.1976). In that case, however, the holding is too narrow to disturb our conclusions. The court held that contract *arbitration* clauses are not enforceable in an attempt to obtain such a clause continuously in new contract after new contract. 543 F.2d at 1170. The court was careful to restrict its holding to the context of arbitration clauses, and noted that the parties would have been bound by the contract arbitration clause in the old agreement to submit issues involving at least "terms and conditions" of employment (*i.e.,* wages, hours, etc.) to arbitration for inclusion in a new contract. *Id.*